IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RYAN A. BARNES,

        Plaintiff,                     No. CIV S-07-1380 GGH P

    vs.

SHERIFF JIM DENNEY, et al.,

        Defendants.           ORDER

_____/

Introduction

        Plaintiff, a state prisoner proceeding with appointed counsel, seeks relief pursuant to 42 U.S.C. § 1983. Pending before the court is defendants' motion for summary judgment, filed on December 7, 2009 (Docket # 69), to which plaintiff filed an opposition, including a response to defendants' statement of undisputed material facts and a supporting declaration, on December 23, 2009 (Docket # 73, #74 and # 75), after which defendants filed their reply on December 31, 2009 (Docket # 76), along with objections and a motion to strike evidence. Plaintiff filed his response to defendants' objections and motion to strike, on January 6, 2010 (Docket # 77), along with another declaration (Docket # 78), one day before this matter came on for hearing before the undersigned, on January 7, 2010. At the hearing Brendan McShane and Laura Vartain Horn of Latham and Watkins appeared for plaintiff, while defendants were

1

represented by John Whitefleet from Porter Scott.[1]  With respect to objections raised by defendants to plaintiff's evidence in support of their opposition to defendants' undisputed material facts,[2] the court will affirm at the outset, as originally expressed at the hearing,[3] that a Ninth Circuit panel, going seemingly afield from prior rulings regarding the significance of authentication of exhibits for summary judgment purposes, basically disavowed that stance.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) ("[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents."[4])  Thus, the court is not overly concerned with a question of the authentication of exhibits at this stage, unless as the undersigned stated, it involves "the case breakers."  Docket # 80, p. 6.

Second Amended Complaint (Verified and Constitutes a Declaration By Plaintiff)[5]

The complaint in this case was originally filed on July 12, 2007, but now proceeds on a second amended complaint, filed on May 14, 2009.  The parties subsequently stipulated to the dismissal without prejudice of the Sutter County Board of Supervisors as a defendant (Docket # 65), and the court, by Order filed on July 7, 2009 (Docket # 66) directed the Clerk of the Court

---

[1] The oral argument on the summary judgment, "restricted to specific users," has been transcribed.  See filing dated February 24, 2010 (Docket # 80).

[2] The court is somewhat puzzled as to why plaintiff limited himself to disputing the majority of defendants' statement of undisputed facts and did not file his own separate statement of material facts in dispute.

[3] Docket # 80, Transcript of January 7, 2010, hearing on defendants' motion for summary judgment, pp. 5-6.

[4] The court quotes from Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir.1991), which in turn relies on Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986), for the proposition that "the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment."  Fraser, supra, at 1037.  But see Hal Roach Studios v. Richard Feiner & Co., 896 F.2d 1542, 1550 (9th Cir. 1990) ("well established that unauthenticated documents cannot be considered on a motion for summary judgment").

[5] McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987).

to note the voluntary dismissal in the case docket.

In the second amended complaint for damages and equitable relief, plaintiff now proceeds against defendants County of Sutter, Sheriff Jim Denney, Officer Willy Mitchell and Officer J. Rouna. The County of Sutter and Sheriff Denney are each sued only in an official capacity. Second Amended Complaint (SAC), ¶¶ 7, 9. Officers Mitchell and Rouna are each sued in both their official and individual capacities. SAC, ¶¶ 10-11. Plaintiff alleges that while he was a pretrial detainee at the Sutter County Jail, he was attacked, on November 26, 2005, by a group of six classified violent gang members, directly resulting from the actions and omissions of the defendants. SAC, ¶ 1.

Plaintiff alleges that he was housed in a protective custody unit reserved for pretrial or convicted sex offenders, but was taken from the unit for recreational (rec) yard time outside by defendant Sutter County Jail Correction Officer (C/O) Willy Mitchell along with the six classified gang members separately housed in a cell unit reserved for inmates "prone to assault." SAC, ¶¶1, 12. Plaintiff at the time did not know these inmates were classified gang members or whether he was supposed to have contact with them or not. Id., ¶ 12.

Specifically, plaintiff alleges that defendant Mitchell came in the late morning and asked plaintiff if he wanted to go outside for rec yard time, at which point plaintiff told that he did and stepped out of his cell unit. Id., at ¶ 13-14. Plaintiff noticed as he stepped out some seven to ten feet in front of him that there were six inmates with shaved heads, apparently of white or Hispanic ethnicity. Id., at ¶ 14. As this was plaintiff's first time at Sutter County (SC) Jail, plaintiff did not know the protocol for associating with the other inmates, but was led to believe that C/O Mitchell with sound judgment knew the procedures involved with his duties and post orders. Id. Plaintiff depended on defendant Mitchell and believed he would not jeopardize his life or subject plaintiff to a high danger risk, especially in light of plaintiff's having been segregated from other inmates purposely as a convicted sex offender. Id.

\\\\\

Once plaintiff was outside his protective custody cell unit, defendant Mitchell called over the radio to inform correctional officers operating the SC Jail's main control room responsible for monitoring all inmate movements in the facility which units he planned to escort to the rec area (or SCU yard). Id., ¶ 15. Plaintiff was directed by defendant Mitchell to stand in line with the six other inmates waiting in the hall outside his cell unit. Id.

In addition to being responsible for monitoring inmate movements in the jail, the main control room C/O's were to maintain video surveillance of security areas inside and outside the facility. Id., ¶ 16. Plaintiff, on information and belief, alleges that defendants knew or should have known that he, as a protective custody inmate, should not have been escorted or left alone in an unsupervised, enclosed rec area with six other inmates housed in the "Max 4" unit, a housing unit "'for those inmates who are prone to assault.'" Id. Plaintiff believes that defendants were, or should have been, aware after defendant Mitchell communicated his intention to take plaintiff with the six other inmates to the SCU yard to be left alone without the presence of officers that plaintiff was at substantial risk of physical harm, but they nevertheless acted with deliberate indifference to his safety and a substantial likelihood of injury to plaintiff, permitting, acting in concert or failing to prevent defendant Mitchell from locking plaintiff in the SCU yard with the classified violent gang members "in clear violation of Sutter County Jail policy." Id.

After defendant Mitchell secured the SCU yard door, leaving plaintiff with the other six inmates, he walked off nonchalantly. Id., ¶ 17. Shortly afterward, one of the six inmates began to ask plaintiff questions, repeatedly asking why plaintiff was in jail and whether he was a gang member. Id. Plaintiff told him he was not affiliated with a gang and that he was being detained for second degree robbery; when the inmate asked if that was "all he was there for," plaintiff fabricated other burglary-related charges to dissuade him from further inquiry. Id. Plaintiff thought he was successful in doing so because the inmate walked away to rejoin the others, wishing plaintiff luck in court; plaintiff could not hear what they said but observed the inmates in animated conversation. Id.

When most of the inmates began hitting a handball around the yard, plaintiff, less worried, stopped paying attention to them; however, the inmate who originally confronted plaintiff (according to a written incident witness report by C/O Rouna) came back and punched him in the head while plaintiff was not paying attention.  Id., ¶ 18.  As if at a planned signal or cue, the other inmates then rushed over and joined in the attack on plaintiff.  Id.  Plaintiff lost consciousness at some point and when he regained consciousness, he was still on the ground being kicked and hit by the other inmates in the yard.  Id.

At some point while he was being attacked, plaintiff looked up to see that defendant Rouna was watching the assault through a large observation window.  Id., ¶ 19.  Although plaintiff thought defendant Rouna would intervene or in some way come out and stop the attack, instead he simply appeared to watch the entire beating.  Id.

In his subsequent written incident report, defendant Rouna indicates having witnessed the whole attack on plaintiff but does not mention any effort on Rouna's part to intervene or prevent the attack, resulting in the attack being prolonged and in greater bodily injury to plaintiff.  Id., ¶ 20.  While being beaten, plaintiff heard derogatory remarks made about African-Americans and sex offenders.  When toward the end of the attack, plaintiff cried out "why are you doing this to me," he recalls one inmate saying, "that's what you get you fucking rapist."  Id.  When defendant Mitchell eventually returned, this time with another officer, he told the inmates "alright he's had enough," at which point the inmates began to back away from plaintiff.  Id., p 21.

On information and belief, plaintiff alleges that when an inmate is being assaulted at SC Jail, the procedure for those officers made aware of the incident by radio communication is to respond immediately to the scene; plaintiff has never seen an instance when even a one-on-one fight involving two inmates did not require the presence on the scene of eight or ten officers.  Id., ¶ 22.  Thus, plaintiff was surprised when only two officers showed up while he was being beaten by several inmates over an extended period, particularly since main control room officers are

required to observe by video security areas and to visually supervise inmate movement.  Id.   The other officer with defendant Mitchell was very small and elderly, weighing no more than 100 pounds.  Id.

Plaintiff found it suspicious that neither of the officers placed handcuffs on the assailants, something plaintiff knows to be a strict mandatory procedure; not handcuffing the assailants unnecessarily exposed plaintiff to further risk.  Id., ¶ 23.  These officers, including defendants Mitchell and Rouna disregarded SC Jail policy and their obligation to protect plaintiff; defendant Mitchell even told plaintiff it was nobody's fault but his own that he was attacked.  Id., ¶ 24.

Plaintiff asked SC Jail staff if they could put away the video tape of the incident for future prosecution evidence against the inmates, but was told once that the tape was mixed up and lost, and another time that there was no tape because the camera was not on at the time of the assault.  Id., ¶ 25.  The video camera was pointed in exactly the area of the beating and was ten feet from where it happened.  Id.

A Yuba City Sheriff's Department officer came to the SC jail to investigate the crime because plaintiff had expressed his intent to press charges against the six inmates; a correctional officer alerted the sheriff's deputy that there were no written reports of the incident as though no crime had ever occurred.  Id. ¶ 26.  The deputy directed SC Jail personnel to prepare written incident reports and immediately deliver them to his department.  Id.  Although plaintiff was in custody of SC Jail when he received a subpoena to appear in superior court for preliminary testimony against the inmates, SC Jail personnel never transported him so that he could testify. Id.

Following the attack, Sutter County doctors and nurses determined that plaintiff needed to be taken to Rideout Memorial Hospital to treat his injuries.  Id. p 27.  Plaintiff suffered permanent physical and emotional injuries from the attack, which he continues to suffer.  Id.

\\\\\

Plaintiff alleges violations of his rights under the Eighth and Fourteenth Amendment resulting in serious physical and emotional injury as a result of defendants' deliberate indifference to plaintiff's safety and their failure to protect him. Id., ¶¶ 29-31. Plaintiff claims that defendants Mitchell and Rouna acted in conflict with SC Jail policy and their duties and were deliberately indifferent to plaintiff's safety and knew of a significant likelihood of harm by their actions and omissions. Id. ¶ 29. Defendants County of Sutter and Sheriff Denney failed to adequately train the defendant officers and the SC Jail staff and otherwise failed to create, implement and enforce policies, measures or directives to segregate and prevent attacks against protective custody inmates and to implement or enforce such policies to immediately stop an attack on inmates once it has begun. Id. p 30.

Plaintiff seeks injunctive relief and money damages, as well as costs and attorney's fees.

Motion for Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, supra, 477 U.S. at 323, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On October 24, 2007 (Docket # 11), the court advised plaintiff (pro se) of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988). Thereafter, pro bono counsel was appointed for plaintiff. See Order, filed on June 9, 2008 (Docket # 22). Current counsel for plaintiff, also of Latham & Watkins, LLP, were substituted in by Order, filed on August 19, 2008 (Docket # 28), with an additional attorney filing a notice of appearance on plaintiff's behalf, on September 24, 2008 (Docket # 33).

*Motion Overview*

Lest the adjudication of this motion gets lost amidst a welter of allegations and counter-allegations concerning the regulations which governed inmate classification and procedures, it is important to set forth the three themes of plaintiff's case. The first theme concerns the County's alleged policy of mixing all inmates in so-called protective custody on the recreation yard regardless of whether those inmates would mix well in any setting. The second

theme focuses on the individual defendants, and asserts that regardless of any policy about inmate mixing, a reasonable jail officer would know that allowing sex offenders to mix with documented gang members posed unacceptable risks of injury. The third theme, distinct from the first two themes, is that the two individual defendants purposefully set up plaintiff to be beaten, or at least, with knowledge that plaintiff would be beaten if events took their course, and they callously allowed it to happen.

The  third theme is distinct somewhat from the first two on a causation basis. That is, if the officers (Mitchell and Ruona) purposefully set up plaintiff for a beating, the bona fides of the policy referenced in the first two themes become irrelevant because the policy did not cause the set-up. While the policy may have facilitated the set-up, the overriding cause of the beating stemmed from the alleged purposeful desire of the two officers to cause plaintiff harm. The alleged set-up can only be seen as the ultra vires acts of two individuals. There are no facts which suggest that the County had a policy of purposefully setting up its jail inmates for non-judicial punishment, or placing an inmate in a situation where that was likely to happen.

The fact that theme three is inconsistent in a sense with the first two themes is of no import in this summary judgment motion. Plaintiff does not have to choose at this juncture the themes he will present before the jury; indeed, plaintiff may present differing scenarios before that trier of fact.

### *Applicable Legal Standard*

As plaintiff was a pretrial detainee, and not a convicted prisoner, at the time of the incident, the applicable standard is by way of the due process clause of the Fourteenth Amendment rather than the Eighth Amendment:

> Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment.

Bell v. Wolfish, 441 U.S. 520, 535 n. 16,  99 S. Ct. 1861, 1873 n. 16 (1979); Frost v. Agnos, 152

F.3d 1124, 1128 ("[c]laims by pretrial detainees are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eighth Amendment"). Nevertheless, as the rights of pretrial detainees under the Fourteenth Amendment "are comparable" to prisoners' Eighth Amendment rights, the same standards are applied. Frost, supra, at 1128, citing Redman v. County of San Diego, 942 F.2d 1435, 1441 (9th Cir.1991).[6]

This is not a case involving the application of force to quell a disturbance in which case a cruel and sadistic standard would apply. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991). Rather, the issue here is one of failure to protect (whether purposeful or otherwise) which would be governed by Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970 (1994) Deliberate indifference is the appropriate standard to be applied here.

A prison official's deliberate indifference to a substantial risk of harm to an inmate violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. at 828, 114 S.Ct. at 1974. To succeed on a claim of deliberate indifference to the threat of serious harm or injury by another prisoner, plaintiff must demonstrate that the deprivation of his rights was "objectively, sufficiently serious." Id. at 834, 114 S.Ct. at 1977. When the claim is predicated upon the failure to protect, the deprivation is deemed to be sufficiently serious if there was a substantial risk that the prisoner would suffer serious harm. Id. The prisoner must also demonstrate that the defendant had a "sufficiently culpable state of mind." Id. The prisoner must demonstrate that the defendant knew of and disregarded an excessive risk to his safety: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S.Ct. at 1979.

Similarly, any alleged entity policy asserted to have caused harm must rise to the level of deliberate indifference.

_____

[6] Plaintiff cited as further precedent Byrd v. Maricopa County Sheriff's Dept., 565 F. 3d 1205, 1216-17 (9th Cir. 2009) (Opp. p. 10, note 6); however, rehearing en banc has been granted for that decision, with the admonition that the opinion of the three-judge panel is "not to be cited as precedent by or to any court of the Ninth Circuit." 583 F.3d 673 (9th Cir. Oct. 9, 2009).

1 *Undisputed Facts*

2     The following of defendants' undisputed material facts are expressly admitted by

3 plaintiff or is a fact that the record reveals is not subject to dispute.  The Sutter County Jail

4 Manual generally provides the policies and practices employed at the jail and "addresses the

5 functions and management of the Sutter County Jail.["]  At the time of the event, defendant

6 Sheriff Jim Denney was the primary executive and policy-maker of the Sutter County Sheriff's

7 Office, overseeing all policies, procedures, hiring, and firing.  In addition, the Sutter County Jail

8 (SC Jail) policies and procedures in effect on November 26, 2005, were approved by the Board of

9 Corrections.  The SC Jail Manual, in electronic form or in hard copy, is distributed throughout the

10 jail down through the chain of command, made available to correctional officers and placed in

11 specific areas of the jail for availability.  Max-4, Max-5 and Max-6 tanks are protective custody

12 special housing units.   Prior to the incident of November 26, 2005, the practice at the jail was to

13 allow the protective custody tanks – Max-4, Max-5, and Max-6 – to take part in Single- Cell Unit

14 (SCU) recreational yard time simultaneously.[7]

15     Plaintiff was transported to and booked into SC Jail on November 11, 2005.

16 Plaintiff was designated as a sex offender, classified as requiring protective custody, and placed in

17 special housing in the Max-5 protective custody tank.  Defendant Denney did not personally take

18 part in the classification, housing assignment, inmate transportation, or direct supervision of

19 plaintiff during the duration of his incarceration at Sutter County Jail.

20     Plaintiff proceeded out to the yard with six or seven other inmates from another

21 tank.  At the time, plaintiff had never previously spoken to any of the inmates and did not know

22 they were Sureños.  While in the yard, one inmate approached plaintiff.  He asked plaintiff why he

23 was in jail, and plaintiff said burglary and second-degree robbery, but mentioned nothing of his

24

25     [7] Defendants maintain that this practice was consistent with Title 15, while plaintiff
26 argues that it was not.  See Defendants' Undisputed Material Facts (DUF) # 11 and plaintiff's
response.  Docket # 74, # 76-2.

1  prior sexual offense.  The other inmate asked if plaintiff was in a gang, to which plaintiff said no,

2  but the inmate did not identify himself as a Sureño.  After the conversation, the inmate walked

3  away.  Shortly thereafter, several of the other inmates commenced to physically assault plaintiff.

4  At 3:37 p.m., defendant C/O Ruona transported plaintiff to Rideout Medical Center to obtain

5  further medical care.

6  *Defendants Denney and County of Sutter – the Monell Policy Claim*

7  Defendants argue that plaintiff's allegations against defendant Sheriff Denney in

8  his official capacity are redundant to the official capacity claims against defendant County of

9  Sutter, and defendant Denney should be granted summary judgment (or adjudication).  Defendants

10  rely on Kentucky v. Graham, 473 U.S. 159, 165-166, 105 S. Ct. 3099 (1985)("[o]fficial capacity

11  suits [under § 1983]...'generally represent only another way of pleading an action against an entity

12  of which an officer is an agent'"(quoting Monell v. New York City Dept. of Social Services, 436

13  U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55 (1978)); see also, Brandon v. Holt, 469 U.S. 464,

14  472, 105 S. Ct. 873, 878 (1985) (actions of department head in his official capacity equates with

15  actions of municipality itself); Cortez v. County of Los Angeles, 294 F.3d 1186, 1189 (9th Cir.

16  2002)[8](county subject to § 1983 liability for sheriff's actions pursuant to his role as county jail

17  administrator); Streit v. County of Los Angeles, 236 F.3d 552, 561 (9th Cir.2001)) (sheriff acts on

18  behalf of county in "the oversight and management of the local jail").  As defendants further

19  contend, plaintiff does not dispute that defendant Denney is sued solely in his official capacity

20  (Docket # 76, reply, p. 13, note 5), the court finds the motion for summary judgment should be

21  granted as to defendant Denney.

22

23          [8] "As administrator of the jail, the Sheriff is responsible for developing and implementing
24  policies pertaining to inmate housing. Cal.Code Regs. tit. 15, § 1050. Part of this task entails the
    establishment of policies and procedures for the segregation of inmates who either pose a danger
25  or are a target for assault, as is necessary 'to obtain the objective of protecting the welfare of
    inmates and staff.' Cal.Code Regs. tit. 15, § 1053; *see also id.* § 1006 (defining goal of
26  administrative segregation as providing 'that level of control and security necessary for good
    management and the protection of staff and inmates')." Cortez, supra, at 1190.

13

1    As to defendant County of Sutter,

2    Section 1983 provides a method by which individuals can sue for
     violations of their federal rights. One of the requisite elements for
3    stating a claim under § 1983 is that the violation was committed by
     a "person" acting under color of state law. Will v. Mich. Dep't of
4    State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45
     (1989). A municipality or other local government entity is deemed
5    such a "person" and may be sued for constitutional torts committed
     by its officials according to an official policy, practice, or custom.
6    Monell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S.Ct.
     2018, 56 L.Ed.2d 611 (1978).

7

8    Cortez v. County of Los Angeles, supra, 294 F.3d at 1188.

9         Defendants frame plaintiff's claims against defendant County of Sutter as

10   allegations that "there were insufficient policies to train officers to prevent or stop such attacks

11   once begun," citing SAC, ¶ 30 [Docket # 62]. Docket # 69, Motion for Summary Judgment

12   (MSJ), p. 20. As defendants note in their reply, however, plaintiff focuses on defendant County's

13   practice of placing all the protective custody units on the rec yard at the same time. Docket # 69,

14   p. 13; see Docket # 73, Opp., pp. 31-34. Defendants maintain that the custom of classifying and

15   housing inmates in protective custody is the type of reasonable action the law contemplates in

16   efforts to protect prisoners, that the practice of permitting the protective custody inmates to use

17   the rec yard together is not unconstitutional and that plaintiff does not cite authority that the

18   mixing of Sureño and sex offender inmates, all in protective custody at SC Jail, shows deliberate

19   indifference. Reply, p. 13.

20        The court will consider the parties' arguments about certain facts in dispute. The

21   parties battle on the jail regulations that governed plaintiff's classification and his activities while

22   in the protective custody. The court considers these regulations, not because a violation of these

23   would be an unconstitutional act per se, but only because their violation may be *evidence* of acts

24   demonstrating deliberate indifference and an issue of fact is raised.

25        Courts interpreting "cruel and unusual punishment" in jail conditions cases have

26   stated that it is improper to constitutionalize state standards or regulations. Hoptowit v. Ray, 682

F.2d 1237, 1248-1249 (9th Cir.1982). Courts analyzing the Eighth Amendment have relied on state regulations as persuasive of "evolving norms of decency" which form the hallmark of an Eighth Amendment violation. See Michenfelder v. Sumner, 860 F.2d 328, 335 (9th Cir. 1988) (relying on a Nevada state regulation in an excessive force taser case); Spain v. Procunier, 600 F.2d 189, 196 (9th Cir.1979) (court may take into account, but is not bound by, state prison regulations concerning the use of force [tear gas] ).[9]

Thus, the court is faced with the choice of "constitutionalizing" state prison regulations for use in the Eighth Amendment context akin to creating a liberty interest in a Fourteenth Amendment context, or in simply using them as evidence to determine what evolving standards of decency are in the Eighth Amendment context. The cases support both choices, however, the court believes that the latter choice is more correct. While the Constitution may be able to tolerate a state-by-state definition of property and liberty interests that are subject to a due process analysis, the term "cruel and unusual punishment" cannot be subject to dispositive state-by-state definition. The Eighth Amendment is one of national concern, and should be applied uniformly. State regulations may be indicative of what the national standards should be, but they are not dispositive of the issue. Therefore, the regulations proffered by plaintiff will be received into evidence for whatever value testimony and argument may give to them, but they will not be constitutionalized. The jury shall be instructed on how to use the state regulations accordingly.[10]

/////

---

[9] There may be some regulations which deal with such basic rights as to warrant a conclusion that the Eighth Amendment is violated if the regulation is violated, those type of regulations are not involved here.

[10] The court could give the following instruction: "When deciding whether defendant violated plaintiff's constitutional right to be free from cruel and unusual punishment, you may consider the state prison regulations that have been admitted into evidence. If you find defendant did not comply with the regulations, this does not mean that plaintiff's Eighth Amendment rights were violated per se. However, if you do find non-compliance, you may consider this when deciding whether defendant's actions were deliberately indifferent."

15

1    In DUF # 3,[11] defendants maintain that defendant Denney was the final authority

2    signing off on their enactment "after being satisfied they met the requirements provided by the

3    Standards and Training for Corrections ("STC") and the Board of Corrections (now known as

4    Correctional Standards Authority)."   Docket # 69-3, p. 2, citing in support the deposition of

5    defendant Denney, 34:15-35:2, 114:10-24.  Plaintiff takes issue only with any implication that the

6    existing policies met the requirements of the STC and Board of Corrections.  Docket # 74, p. 2.

7    Plaintiff avers that the "admitted 'common practice' and policy of mixing inmates from the Max 4

8    (Sureno, "prone to assault") tank and the Max 5 (Sexual Offender) tank is inconsistent with the

9    plain language and requirements of Title 15."  Id.   Plaintiff contends that  "the policy of mixing

10   inmate classifications out on the exercise yard is inconsistent with Title 15," quoting a portion of

11   CAL. CODE REGS. tit.xv, § 1050(a) (2009) ("Each administrator of a Type II or III facility shall

12   establish and implement a classification system which will include the use of classification

13   officers or a classification committee in order to properly assign inmates to housing, work,

14   rehabilitation programs, and leisure activities.  Such a plan shall include the use of as much

15   information as is available about the inmate....").   Docket # 76-2, pp. 2-3.  Plaintiff also contends

16   that defendants' expert [Jeffrey Hislop] acknowledges, "leisure activities" includes yard time.

17   Docket # 76-2, p. 3, citing Declaration of Brendan McShane (McShane Dec. in support of

18   Opposition (Opp.) to MSJ, Exh. 8 at 114:11-16:

19              Q.  And do you have an understanding as to what leisure activities
            refers to?
20          A.  Leisure activities are anything that is not programming,
            education or vocational programming, not in-house duty
21          assignments or work assignments.  It's off time, yard time, watching
            TV, those kinds of things.
22

23   However, when plaintiff asserts that to the extent that defendants had a policy of classifying

24   admitted gang members or inmates "prone to assault" as "protective custody" inmates, it was

25

26   _____

[11] Defendants' Undisputed Material Facts (DUF) in support of their MSJ.

16

contrary to CAL. CODE REGS. tit.xv, § 3341.5(a)(3), which precludes protective housing for inmates who are documented prison gang members or affiliates or (4) who pose a threat to other inmates in protective housing, the court finds defendants' objection on this point well-taken. As defendants maintain, "Division 3 of Title 15 applies to adult facilities run by the state Department of Corrections and Rehabilitation, not local detention facilities like the Sutter County Jail, which is governed by CCR Title 15, Division 1, Chapter 1, Subchapter 4: Minimum Standards for Local Detention Facilities." Docket # 76-2, pp. 3-4. Therefore, plaintiff's dispute based on regulations appropriate for state adult prison facilities is not germane; however, plaintiff raises a genuine issue with regard to whether the policies in effect at the relevant time, i.e., mixing protective custody inmates on the rec yard, were consistent with the admittedly applicable CAL. CODE REGS. tit.xv, § 1050(classifying inmates in protective custody units) in terms of proper assignment for leisure activities.

In DUF # 6, defendants excerpt a number of the written policies set forth in the SC Jail Manual with regard to the classification process:

> J103.30 - INMATE CLASSIFICATION AND PLACEMENT:
> The Sergeant, [Officer in Charge] or assigned Correctional Officer shall gather sufficient information on each inmate to properly assign him/her to a housing area, based on the needs and security of the jail and the needs of the inmate.
>
> J121.00 - CLASSIFICATION OF INMATES: The classification system in place at the Sutter County Jail is designed to utilize to the fullest advantage the physical design of the custody facility while meeting the requirements of law under California Administrative Code, Title 15, and Minimum Jail Standards, section 1050, 1051, 1052, 1053, and 1082 and under California Penal Code sections 4001 and 4021. The ultimate goal of the classification system is to assign housing to inmates in such a way as to maximize individual compatibility and unit stability for both inmate and staff safety. The effectiveness of this classification system will be demonstrated by a low incident rate within the Sutter County Jail.
>
> J121.30 CLASSIFICATION SYSTEM: The classification system considers a limited but significant, specific list of variables which describes and identifies the kinds of basic

problems that inmates may present to a custody operation.

The system objectives are to specify the critical variables utilized in making housing decisions and to structure the decision making process to reduce disparity in treatment of inmates. Specific objectives are as follows:

[1] Provide the legally mandated segregation of prisoners, i.e. male from female, civil from criminal, mentally disturbed, physically dangerous or physically diseased from general population.
[2] Reduce the number of assaults on both inmates and staff.
[3] Provide for segregation of vulnerable prisoners from assaulting, and aggressive prisoners and both groups from the general population.
[4] Provide for segregation by degree of security risk and criminal sophistication.
[5] Provide that no prisoner be held in a more secure status than his/her potential risk dictates.
[6] Provide a system consistent with individual dignity and basic concepts of fairness.
[7] Provide individual prisoners participation in decisions regarding their placement/designation.

J121 .50 - CLASSIFICATION CRITERIA: Each incoming prisoner will be evaluated on a five point scale in each of the following areas during booking. Additionally the prisoner will be asked if there is anything that the staff should know before making a housing decision. Based on the evaluated areas the booking officer will issue the prisoner a wristband and make a temporary housing assignment.

The classification and housing assignment will be recorded in the prisoner's arrest package on the form provided. The classification and housing assignment will be reviewed by a member of the Classification Committee.

Prisoners will be evaluated in each of the following areas:
[1] Current charges - Lightweight misdemeanor to major violent felony charges.
[2] Criminal history - No record to multiple major felonies.
[3] Physical appearance - Small/mild to large/prison gang tattoos.
[4] Attitude at booking - Cooperative/pleasant to violent/combative.
[5] Medical issues - No medical problems to life threatening or suicidal.

DUF# 6, SC Jail Manual, 19, 63-65 (attached as Exh. A to Bidwell Dec.)[12]  The court's review

indicates, with the exception noted in footnote 12, that the provisions set forth by defendants in

their DUF are contained in the SC Jail Manual, stamped as updated on 7/26/05, which plaintiff

essentially concedes, and in that sense DUF # 6 is essentially undisputed.  However, plaintiff

takes issue with any assertion that these written policies represent the only written policies

regarding the classification process, pointing to the following provision:

> J.133.00 – ADMINISTRATIVE SEGREGATION:
> The Jail provides for the administrative segregation of inmates who
> are determined to be <u>prone</u> to escape, <u>assault</u> staff or other
> inmates, if such segregation is determined necessary for the welfare
> of the inmates and/or staff.
>
> Administrative segregation shall consist of separate and secure
> housing but shall not involve any other deprivation of privileges
> other than is necessary to obtain the objective of protecting inmates
> and staff.

Response to DUF in Opp., McShane Dec., Exh. 18 at SCJ0152 (emphasis added by plaintiff).

While defendants consider this response irrelevant and argumentative, asserting that the inmates

at issue herein were not housed in ad seg but in protective custody (Docket # 76-2, p. 4, reply to

response in opp. to defs. DUF #6 and Docket # 76, Reply, p. 14), this provision might arguably

beg the question why the Sureños were not so classified.

> In DUF # 11, defendants assert:

> Prior to the incident of November 26, 2005, the practice at the jail
> was to allow the protective custody tanks - Max-4, Max-5, and
> Max-6 - to take part in Single- Cell Unit recreational yard time, as
> per Title 15, simultaneously.

Docket # 69-3, p. 5, citing in support, Bidwell Decl., ¶10.

---

[12] Defendants also include as a provision in their DUF: "J121.80 -RECLASSIFICATION:
An inmate may be reclassified based on his behavior while incarcerated. An inmate may request
a review of his classification every thirty days . Permanent reclassification will be enacted or
approved by a supervisor. A simple housing change does not necessarily require reclassification."
However, this section is not included within the evidence cited in support of this DUF.  On the
other hand, plaintiff does not dispute that this provision is included in the jail manual; moreover,
this section *is* produced among plaintiff's exhibits.  Resp. to DUF in Opp., McShane Dec., Exh.
18.

Plaintiff disputes no part of this DUF, except to the extent that "it suggests that mixing such groups was consistent with Title 15." Docket # 74, p. 6. To the extent that plaintiff suggests that the policy of simultaneous rec-yard use by the three protective custody tanks is inconsistent with those regulations governing adult state prison facilities, the basis for this aspect of any dispute is not well-grounded. Docket # 74, p. 6; Docket # 76-2, p. 9. However, plaintiff does again raise an issue with regard to how compliant such a procedure is with CAL. CODE REGS. tit.xv, § 1050(a). Plaintiff cites again to the evidence he produced in response to DUF # 3. Plaintiff also points to defendant Ruona's testimony that he "do(es)n't know" and that he would be "speculating" in trying to answer the question whether "any protective custody inmates can be mixed together," and to his testimony that since the incident at issue he was not aware of any other instance in which Max 4 and Max 5 inmates have been on the SCU yard at the same time. Docket # 74, pp. 6-7, citing [Docket # 75-7] McShane Dec., Exh. 6, defendant Ruona's Dep.: 139:6-19,[13] 150:20-25. Plaintiff also notes testimony from defendant Mitchell indicating that he was not aware of any rules or policy concerning whether inmates from different housing units could be on the exercise yard together. Docket # 74, p. 7, citing [Docket # 75-5] McShane Dec., Exh. 4, Mitchell Dep.: 152:8-15.

In DUF # 12 through DUF # 15, defendants attest to the SC Jail staff training requirements, including assertions that defendant Mitchell has taken training courses on gangs and gang identification and that defendant Ruona has had further training in the classification of inmates, most of which plaintiff takes issue with. The court, however, regards the statements regarding the training policy of the SC Jail, whether strictly complied with or not, as something of a red herring. Both sides have agreed that before the November 26, 2005, incident, the practice at SC Jail was to allow the protective custody tanks – Max-4, Max-5, and Max-6 – to take part in

---

[13] In citing the Ruona Dep. at 137:11-23, plaintiff does not point to the appropriate point in Ruona's Dep. for the testimony about his "speculating;" however, the court in its review has noted the correct page and lines.

single-cell unit recreational yard time simultaneously (and to that extent, DUF # 11 is undisputed).

In light of this undisputed policy, plaintiff confusingly argues that the individual defendants were

not trained on what they contend is a constitutionally deficient policy, or that they were trained in

the deficient policy and followed it.  The first contention is a "so what," the second contention is

adjudicated below in the individual defendants section.  If plaintiff is arguing that the officers

should have been trained in a "correct policy," that issue is completely subsumed in whether the

County's policy was deficient in the first place – an allegation about training adds nothing to the

case.  The court will not further speak about training.

Plaintiff disputes with regard to DUF # 24 that in the context of Max-4, Max-5,

Max-6 protective custody special housing units for inmates "prone to assault" that prone to assault

solely means inmates who may be likely to be assaulted by other inmates.  Defendants cite the

Bidwell Declaration[14] for support for that proposition, ¶ 4, while plaintiff counters that defendant

Mitchell declared that "prone to assault" also describes inmates "who may be likely to assault

other inmates," citing defendant Mitchell's Dec., ¶ 3, in support of the motion for summary

judgment (MSJ).  Plaintiff also points to testimony of defendants' expert.  Exhibit 8 to McShane

Dec.[15] in Opposition (Opp.) to MSJ, [Jeffrey] Hislop Deposition (Dep.), 130:20-23.[16]  Plaintiff's

expert, [Daniel] Vasquez, testified that prone to assault "mean[s] you are assaultive, you're

potentially assaultive toward inmates or staff."  McShane Dec., Exh. 7, Vasquez Dep. 101:9-13,

108:6-8.  In addition, plaintiff contends that when defendants refer to aggressive/assaultive

inmates in other circumstances, they have used the phrase "prone to assault," citing McShane

---

[14] Norman Bidwell in his declaration identifies himself as a Jail Lieutenant employed at
SC Jail by the Sutter County Sheriff's Office and one who is "familiar with the policies and
procedures included in the Sutter County Jail Manual as well as the custom and practice of jail
operations."  MSJ, Bidwell Dec. ¶ 1.

[15] Brendan McShane submits his declaration as counsel for plaintiff in opposition to the
MSJ.  Docket # 75.

[16] "My definition of prone to assault doesn't necessarily mean that they are prone to
assault other people.  It also can mean they are prone to be victims of assault."

Dec., Exh. 18 at SCJ0152 ("The Jail provides for the administrative segregation of inmates who are determined to be prone to escape, assault staff or other inmates if such segregation is determined necessary..."). Thus, the record demonstrates, at a minimum, that a material issue of fact is in dispute as to whether "prone to assault" is limited to signifying prone to being assaulted, rather than prone to assaulting others.

In DUF # 25, defendants maintain that both Sureños and inmates with a sex offender designation come within the protective custody classification "and will generally be housed in either Max-4, Max-5, or Max-6 tank," citing Bidwell Dec., ¶ 4, Docket # 69-3 [Docket # 69-7]. Plaintiff, in dispute, cites, inter alia, a December 7, 2002, SC Jail memorandum entitled "Cell designation for Classification Purposes" directed to "All Jail Staff," which states in part, "Max W4, W5 and W6 are 'special housing' units. Max 4 is for those inmates who are prone to assault, and Max 5 and 6 are for sex offenders." Docket # 74, p. 14, Rsp. to DUF, [Docket # 75-7] McShane Dec., Exh. 17 (copy of the 12/7/02 memo). Plaintiff also identifies the report by the investigating officer of the incident, Paul Hillegrass, wherein reports that a C/O named Wicker stated that Max 4 housed admitted Sureños. Id., [Docket 75-11], McShane Dec., Exh. 10, SCJ0011. Thus, a material fact in dispute is whether a tank housing Sureños, admitted gangmembers, is virtually interchangeable with sex offenders. Defendants insist in DUF #30 and # 31 that prior to the incident at issue they were unaware of any prior attacks at SC Jail between Sureños and African American inmates or of any animus by the Sureños against either African American inmates or those classified as sex offenders. Docket # 69, pp. 7-8, citing defendant Denney Dec. ¶ 4; defendant Mitchell Dec., ¶ 5; defendant Ruona Dec.¶ 5, and Bidwell Dec.,¶¶ 7-8. While plaintiff does not counter with specific prior incidents of attacks between Sureños against either African American inmates or sex offender inmates, plaintiff produces enough evidence to raise an issue as to this point. See Docket # 74, # 75 and below.

It is undisputed that Max-4, Max-5 and Max-6 tanks are protective custody special housing units and that prior to the November 26, 2005, incident, it was the practice at SC Jail to

allow these protective custody tanks – Max-4, Max-5, and Max-6 – to take part in Single- Cell

Unit (SCU) recreational yard time simultaneously, notwithstanding that one of the tanks housed

gangmembers and at least one other housed sex offenders.

> *Monell* Liability

The Supreme Court has established that:

> [A]lthough the touchstone of the § 1983 action against a
> government body is an allegation that official policy is responsible
> for a deprivation of rights protected by the Constitution, local
> governments, like every other § 1983 "person," by the very terms of
> the statute, may be sued for constitutional deprivations visited
> pursuant to governmental "custom" even though such a custom has
> not received formal approval through the body's official
> decisionmaking channels.

Monell v. New York City Dept. of Social Services, supra, at 690-691, 98 S.Ct. at 2036; see also

Board of County Com'rs of Bryan County v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382 (1997)

("[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a

municipal 'policy' or 'custom' that caused the plaintiff's injury.").   On the other hand, a

government entity cannot, under § 1983, be held liable under a theory of respondeat superior or

vicarious liability only "because it employs a tortfeasor" or "for an injury caused solely by its

employees or agents."  Monell, supra, at 691, 694, 98 S. Ct. at 2036-2037.  Thus, it is only "when

execution of a government's policy or custom ... inflicts the injury that the government as an

entity is responsible under section §1983."  Id. at 694, 98 S. Ct. at 2037-2038.

> The plaintiff must also demonstrate that, through its *deliberate*
> conduct, the municipality was the "moving force" behind the injury
> alleged. That is, a plaintiff must show that the municipal action was
> taken with the requisite degree of culpability and must demonstrate
> a direct causal link between the municipal action and the
> deprivation of federal rights.

Board of County Com'rs., supra, at 404, 117 S. Ct. at 1388 [emphasis in original].

Under § 1983, the practice of mixing inmates in the rec yard must amount to

"deliberate indifference" to plaintiff's rights.  City of Oklahoma City v. Tuttle, 471 U.S. 808, 823,

105 S. Ct. 2427, 2436 (1985) ("[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.")

In this instance, plaintiff contends that the custom of defendant County to permit the mixing of special housing inmates on the rec yard, acknowledged by defendants as a jail practice (or former practice until the incident at issue), notwithstanding that these inmates could be several gangmembers mixed with a single sex offender, evinced deliberate indifference to plaintiff's constitutional rights and was a direct cause of his injury. On this motion, as previously noted, all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356. There is enough evidence "from which a reasonable jury could find that the jail officials were acting pursuant to County policies or customs" when defendant Mitchell placed plaintiff on the rec yard alone with the Max-4 inmates. Docket # 73, Opp. to MSJ, pp. 31, 34; Redman v. County of San Diego, 942 F.2d 1435, 1444-1445 (9th Cir. 1991) (custom may be unwritten).

Regulations and disputes about their application aside (and it may be that the parties are losing sight of the constitutional forest for the regulatory trees), defendants' position is inconsistent, begs the issue, and raises questions of fact by itself. Defendants acknowledge that plaintiff, classified as a sex offender, needed to be placed in protective custody so as to be separate from the general population (which contains a mix of inmates awaiting trial or convicted of a myriad offenses) *simply because it would be dangerous to house sex offenders in the general population*. However, defendants then essentially argue the remarkable assertion that their policy can stop there. That is, no matter how dangerous the persons to sex offenders may be who are housed *within* protective custody for other reasons, there is no duty to fashion further policies that would protect the potential sex offender victims. If defendant's arguments were to hold sway, persons like the mythical Hannibal Lecter of *Silence of the Lambs* would be permitted unrestrained access to all persons within protective custody, so long as Hannibal were housed there as well.

24

The point here is not whether the minority-in-number Surenos (when in general population) needed protection from a larger gang, but whether when in the confines of protective custody, the minority might become the majority aggressor. Inmates' dislike of sex offenders, and propensity for violence thereto, does not evaporate simply because the inmates are placed in protective custody along with sex offenders. It might well be deliberately indifferent to give gang members unrestrained access to sex offenders in the recreation yard *wherever* the gang members are housed. This determination about a defective policy within protective housing (one size fits all), or a lack of a differentiated policy within protective housing, is for the trier of fact.

*Defendants Mitchell and Ruona*

As set forth in the Overview, plaintiff maintains two theories against these officers in their individual capacity: (1) that they purposefully set up plaintiff for a beating, or at the very least, knowingly allowed events to take their natural course with the predictable harm ensuing, and/or (2) they applied a jail policy which they knew was deliberately indifferent to plaintiff's safety given the circumstances. The undersigned takes the easier scenario first.

Legitimate inferences can be drawn which suggest that plaintiff was set up by these officers. The undersigned emphasizes that these inferences are not the only ones to be drawn and that the trier of fact might well believe the officers at trial. The undersigned understands full well that the officer defendants will testify to different and/or additional facts which they believe exonerate them. This is summary judgment, however, and the reasonable inferences which favor plaintiff must be drawn. The court sees no need to detail all the refutations of the officer defendants here, as such a refutation simply demonstrates that there are two sides to the allegations – something that gives defendants no aid on summary judgment. *Thus, the court is not simply taking a one-view only by recitation of plaintiff's points below;* the court is simply not wasting time and paper for no purpose herein by simply repeating defendants' contrary contentions which must await trial in any event.

\\\\\

The facts produced by plaintiff upon which the inference (1) can be drawn include: (1) that plaintiff was procured for the exercise yard after the Surenos had been lined up, i.e., these gang members knew that plaintiff was coming from the "special" protective custody:

(2) the common knowledge that mixing a sex offender in with potentially aggressive inmates on the yard was a volatile mix, see below;

(3) the testified-to impassiveness exhibited by Officer Ruona as he allegedly watched plaintiff be beaten on the yard, Verified Complaint, Ruona Dep. 91. 100, 101, 102;

(4) the fact that the aggressors were dispatched so easily when Officer Mitchell and the slightly built other officer arrived to break up the fight, Verified Complaint, Barnes Depo at 71;

(5) the comments allegedly made by Mitchell to call off the fight: "alright, he's had enough," Barnes Depo at 72, and that "it's nobody's fault but your own that you were attacked;" Verified Complaint;

(6) the "lost" or turned off video surveillance of the fight; See Barnes Depo at 76, Ruona Depo at 76, Arana Depo at 113.

(7) the lack of immediate investigation of the fight by these defendants and other local jail officials, e.g., Verified Complaint; Ruona Depo at 120-121.

The undersigned will not belabor the obvious – all of these facts, especially when taken together, can suggest that these two defendants were controlling events which led up to the beating, or at the very least bespeak a knowledge that these officers knew precisely what was going to occur. Nor will the undersigned belabor an analysis on qualified immunity for this scenario. Any and every reasonable corrections officer would know that the Eighth Amendment would be violated if an officer set up the beating of an inmate by other inmates, or knowingly, permitted or facilitated the inevitable beating. Cf. Baird v. Renberger, 576 F.3d 340, 345 (7th Cir. 2009) (some propositions are obvious without case authority).

The second scenario is more difficult. Again, it is undisputed that the jail policy was to allow, indeed, require, the use of the recreation yard by all of those in protective custody at

the same time. Such a policy was probably born of the not unimportant need for administrative efficiency in putting the inmates through their day. However, the issue here is whether reasonable officers would have known that an exception to the policy was in order given the make-up of protective custody at the time plaintiff was housed therein.

The court finds that an issue of fact exists with respect to this second scenario. First, Officers Mitchell and Ruona knew of the fact that it was dangerous to allow sex offenders to be housed and to intermix with non-sex offender inmates.

In support of DUF # 7, defendants rely on both the deposition of defendant Denney, attached as Exh. A to the Whitefleet[17] Dec., at 40:8-25, 51:12-24 and the Bidwell Dec., ¶ 2, stating that:

> The purpose of the policy of classifying inmates is to place them in the most appropriate housing unit for inmate safety, as based upon the level of inmate sophistication, as determined by affiliations, past criminal history, and current charges.

In response to this DUF, while not disputing that this is a purpose of classifying inmates, plaintiff argues that it is not the only purpose, that is, that "classification applies more broadly to the separation of inmates for other purposes, including recreational yard time," citing in support McShane Dec., Exh. 4 at 74:22-77:6 (defendant Mitchell Dep.) (Docket # 75) (plaintiff generalizes defendant Mitchell's testimony as supporting the premise that having separate yards serves the purpose of keeping inmates in general housing and those in protective custody who cannot be mixed from being mixed). The court's review of plaintiff's exhibit shows the following to be part of defendant Mitchell's testimony:

> Q. And what's your understanding as to what classification purposes does having separate yards fulfill?
> A. Inmates can be in general housing, for whatever reason, they go to different yards.
> Q. ... It separates the inmates that are housed in the dorms from the

---

[17] John Whitefleet, associate of Porter Scott, counsel for defendants. Whitefleet Dec., ¶ 1, in support of MSJ.

inmates that are housed in other areas for recreational yard time?
A. Yes.
Q. And to the best of your understanding, why would this - - why is
this important?
A. Because you don't want to get an inmate hurt or injured.
Q. And why would an inmate be likely to be hurt or injured if they
weren't separated?
...[18]
The Witness: Because classification, if he's protective custody, I
couldn't throw him in the dorm yard.
By Ms. Chang: So would a protective custody inmate be likely to be
hurt in the dorm yard?
A. Oh, yes.
Q. And why is that?
...[19]
The Witness. Why is that? Why is - - I mean you got - - you know,
you got sex offenders. You got rapers. You know, you have to
keep them, you know - - they can't be together. They don't get
along, you know.
Q: And when you say they can't be together, do you mean sex
offenders and rapers and the general inmate population?
A. Right. Right.
Q. And why couldn't they be mixed together?
...
A. Because those guys don't - - they don't like molesters and
rapers, you know.

Mitchell Dep., 75: 7-24; 76:2-9, 12-21; 77:5-6.

Moreover, plaintiff asserts, excerpting a portion of section J121.30 (set forth

above) that another purpose of the policy of classifying inmates is to "[p]rovide for segregation of

vulnerable prisoners from assaulting, and aggressive prisoners and both groups from the general

population." See also Docket # 75, Exh. 18 to McShane Dec. at SCJ0147. Plaintiff also

contends that defendant Ruona understood that the "purpose of classification" was that "no fights

or anything occur," citing McShane Dec. (Docket # 75), Exh. 6 (defendant Ruona Dep.) at 30:2-7;

65:16-19; 86:8-87:2 and Exh. 3 at 21:16-22 ([Nola] Thompson Dep.) (wherein a Sutter County

\\\\\

---

[18] Objections are omitted from this excerpt.

[19] Again any objections, and there were several, are omitted from this excerpt.

28

Jail sergeant[20] testified that her understanding of the purpose of protective custody is "[i]n my opinion, it's to keep somebody safe from the general population for getting their face bashed in.")

The court sets forth a little more fully some of the specific testimony of defendant Ruona cited by plaintiff on this point:

> Question: What is your understanding of the purpose for classifying inmates?
> The Witness: .... So, they do not - - so they all get along, basically no fights or anything occur.

Defendant Ruona Dep.: 30:2-7.

> Q. And is it your understanding that Max 5 at Sutter County Jail during the November, 2005 time frame housed sexual offenders?
>
> A. Yes.

Defendant Ruona Dep.: 65:16-19.

> [Regarding Max 5 protective custody on November 26, 2005 (Ruona Dep.: 86:8, 13-15]:
>
> Q. ... was it your understanding at that time that it was not only just protective custody but sexual offenders?
> ...[21]
> The witness: Yes, but I'm not a classification officer, so I wouldn't know. I mean...

Defendant Ruona Dep.: 86:21-23; 87:1-2.

Plaintiff's point is well-taken that Sgt. Thompson, a current correctional SC Jail sergeant who has been employed by Sutter County for a number of years, apparently a period which encompasses the date of the incident at issue, offers testimony, qualified by her as her own opinion, that is both relevant and admissible. As to defendant Mitchell, plaintiff is also correct (id.) that this defendant's deposition testimony is an admission. See Fed. R. Evid. 801(d)(2)(A). Moreover, his testimony focuses on his experience and is that of a percipient witness. Docket #

---

[20] Thompson Dep. at 12:2-6.

[21] Objection omitted.

77, pp. 7-8.   Similarly, defendant Ruona can testify to his own knowledge or understanding of jail classification policy and his testimony as well constitutes an admission.

Furthermore, the experts have testified to the common knowledge of not intermixing sex offenders and various other inmates.  Plaintiff's expert[22] testified:

> The witness: I don't know if he knew if there were any specific threats but he should have known better.  That's corrections 1A that I mentioned earlier, he should have known better than to take an African-American inmate with the charges of sex charges and mix them with Sureno gang members.  That should have never happened.

Vasquez Dep.: 122:7-18.

Defendants' expert testified that "it's a well-known fact that assaults occur when people are out of their individual living spaces .… []in the yard" and that "if there is a unit that is only sex offenders and in a small jail like that it would be hard to keep that knowledge from becoming general knowledge..." Docket # 74, p. 12 [Docket # 75-9] Hislop Dec. 157:7-10; 168:1-14.

Plaintiff insists defendants' own expert testified that he would not put any single sex offender with any six other inmates who knew he was a sex offender.  Docket # 75-9, Exh. 8, McShane Dec., Hislop Dep.: 173:19-22.  Defendants' contention in reply that their expert was referring to San Joaquin County Jail and not Sutter County Jail appears to be hair-splitting.  Docket # 76, Reply, pp. 4-5 & note 2.  Plaintiff also observes that Josefina Arana, an SC Jail officer working on the date plaintiff was attacked, testified that she recalled being told that sex offenders were housed in Max 5 "basically to protect them from being assaulted, bothered or any type of violence towards them to protect them" and that "sex offense charges are not very liked by other inmates, so they needed protection basically from them."  Docket # 74, p. 12 [Docket # 75-3], Exh. 2, Arana Dep.: 54:6-55-1.  Plaintiff again emphasizes that CAL. CODE REGS. tit.xv, § 1050(a)

---

[22] Confusingly, plaintiff misidentified deponent Vasquez, their expert, as defendants' expert at least at one point.  Docket # 74, p. 10.

1  that inmate classification extends to inmates' "leisure activities," which encompasses rec yard

2  activity.

3          When defendants in DUF # 29, maintain that Sureños "are a significant minority

4  housed in protective custody" (citing MSJ, Bidwell Dec. ¶ 6) to be kept separate "from the sizable

5  number of Norteños in the jail's general population,"[23] plaintiff challenges, inter alia, the

6  appropriateness of housing these gang inmates in protective custody, citing again Cal. Code Regs.

7  tit.xv, § 3341.5(a)(3), which the court has found inapposite in the context of a local detention

8  facility.  In any event, as previously stated, what is at issue herein is not where the Sureños were

9  housed, as the fact that they were housed in a separate unit of the protective custody housing in a

10  jail facility is not particularly germane to the question of whether or not allowing the sex offender

11  and gang member inmates to intermix during recreation time on the same yard violated the Eighth

12  Amendment.

13          Defendants now argue, despite admissions to the contrary, that defendants Mitchell

14  and Ruona did not violate plaintiff's constitutional rights, focusing on their subjective awareness,

15  or claimed lack thereof, of any instance of prior attacks by Sureños upon either African-American

16  or sex offender inmates, or of any animus harbored by Sureños against either of these groups of

17  inmates.  MSJ, pp. 15-16.  They assert that these defendants knew of no specific or general threat

18  against plaintiff; that plaintiff failed to inform them of any risk to himself and that they were as

19  surprised as plaintiff when plaintiff was attacked.  Id., at 16.  As noted above, plaintiff provides

20  ample evidence to belie the notion that defendants Mitchell and Ruona, both jail correctional

21  officers, had what might charitably be characterized as a naive lack of awareness of animosity of

22  almost any class of inmates generally against sex offender inmates, despite the protective housing

23  the SC Jail provided for them and despite the fact that such animosity is well-known even among

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25          [23] Plaintiff in response to DUF # 28, at least concedes that these two gangs, Sureños from
   southern California and Norteños from northern California, are rivals, while insisting that
26  Norteños are not their only rivals, i.e., providing some support for including African-Americans
   as their rivals [Docket # 74, p. 18].

31

common citizenry.  That the SC Jail had a policy allowing the intermixing of gang inmates with sex offenders notwithstanding, it is hard to discern how any reasonable jail officer could have believed that an unsupervised mix of six gang members with any inmate not so associated, much less a sex offender, could have been anything but a potentially potent mix.[24]  In other words, was it deliberately indifferent not to recognize a needed exception to the then overall policy of intermixing all protective housing inmates.  Suffice it to say, plaintiff has raised a genuine factual issue as to whether these officers, in the circumstances, were deliberately indifferent to his safety, an issue that must be resolved by a jury.

### Qualified Immunity

Defendants contend that defendants Mitchell and Ruona are entitled to qualified immunity.[25]  Docket # 69, MSJ, pp. 18-20.  In resolving a claim for qualified immunity the court addresses two questions: (1) whether the facts, when taken in the light most favorable to plaintiff, demonstrate that the officer's actions violated a constitutional right and (2) whether a reasonable officer could have believed that his conduct was lawful, in light of clearly established law and the information the officer possessed.  Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987).  Although the Supreme Court at one time mandated that lower courts consider these two questions in the order just presented, more recently the Supreme Court announced that it is within the lower courts' discretion to address these questions in the order that makes the most sense given the circumstances of the case.  Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808 (2009).

Based on the issue raised by the conceded practice, prior to the event at issue, of permitting the mixing of inmates on the rec yard from the various protective custody units,

---

[24]  Defendants make a reference to any claim for equal protection that plaintiff may attempt to assert, noting, nonetheless, that such a claim has not been separately pled.  See MSJ, p. 18.  No equal protection claim is at issue herein.

[25]  At one point, defendants argue that defendant Denney is also entitled to such immunity (Docket # 69, MSJ., p. 6), but, of course, qualified immunity is not available or apposite for a defendant sued only in an official capacity.

defendants Mitchell and Ruona have a colorable argument to make for qualified immunity with

respect to inference or Scenario 2.  However, on qualified immunity analysis, if issues of fact

exist– issues which must be determined by the trier of fact at trial – qualified immunity cannot be

found on summary judgment.  Tennison v. City and County of San Francisco, 570 F.3d 1078,

1095 (9th Cir. 2009).  In addition, contrary to defendants' argument that the policy at Sutter

County Jail permitting all inmates in protective custody (regardless of potential danger

engendered thereby) to use the recreation yard simultaneously has never been found

unconstitutional, the precise situation need not have been developed in prior case law.

Reasonable extrapolations of prior law to circumstances where it would have been apparent to

reasonable officers will suffice to determine reasonableness in the particular circumstances.

Burke v. County of Alameda, 586 F.3d 725, 734 (9th Cir. 2009).

        The undersigned will not repeat all of the facts and inferences favorable to plaintiff

which have been previously set forth.  Suffice it to say here, that the law recognizing the danger of

intermixing sex offenders with other classifications of inmates – even in jail settings as opposed

to prison – is well established.  Bylery v. Deputy Warden, 246 Fed. Appx. 512 (9th Cir. 2007);

Glick v. Walker, 272 Fed.Appx.514 (7th Cir. 2008); Jones v. Blanas, 393 F.3d 918, 923 (9th Cir.

2004) (recognizing that California law, as applied to jails, requires that sex offenders within

county jails awaiting trial for SVP purposes must be "confined separately and distinctly" from

general population).  It is only a small, reasonable expansion of Blanas to find that within

protective custody itself, if potentially violent prisoners are housed within protective custody

simply because they represent a minority-in-numbers gang membership, sex offenders should be

confined (including for recreation purposes) "separately and distinctly" from the "minority" gang

members.  See also Sexton v. Ellison, 2009 WL 1544311 (E.D. Ark. 2009).

        The undersigned pauses because adherence to an official policy is a factor which

should be considered when determining qualified immunity, but it is only a factor, not an

immunity card.  "Such a[n] [official] policy, of course, could not make reasonable a belief that

was contrary to a decided body of case law." <u>Wilson v. Layne</u>, 526 U.S. 603, 617, 119 S.Ct. 1692, 1701 (1999). In balancing the common knowledge prohibiting the intermixing of sex offenders and other inmates, especially those prone to violence, e.g., gang members, and the case law set forth above, with a claimed adherence in Scenario 2 of "just following policy," the undersigned finds issues of fact which require trial.

*Conclusion*

Again emphasizing that the undersigned has found issues of fact – not liability – IT IS ORDERED that defendants' motion for summary judgment, filed on December 7, 2009 (Docket # 69), which came on for hearing on January 7, 2010 (Docket #'s 79-80), is granted as to defendant Denney, and denied as to all other defendants.

DATED: 03/17/2010

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
barn1380.msj

34